The Honorable Robert D. McLaren presiding. Your Honors, the first case on the docket this morning is 2-22-0154, Enraged Marriage of General Almodovar, Petitioner Apolli, and Janet Almodovar, Respondent Appellant, arguing on behalf of the Appellant, Mr. David C. Adams, arguing on behalf of the Apolli, Mr. Michael G. DiDomenico. Thank you. Mr. Adams, you may proceed. Okay. Yes, one moment here. Okay. From the outset, I'd like to note that there's one common thread throughout all the three issues raised by the Appellant, and that's just sort of basic justice for Janet, and again, this speaks to the issue of allocation of the marital estate, it speaks to maintenance, and it speaks to Mark's contribution for her fees. Again, there's a lot of crossover between the elements here throughout the IMDMA, the Illinois Marriage and Dissolution of Marriage Act. Today, Janet is 60 years old. She was 58 years old at the time of the dissolution judgment. She has only a 10th grade education from Puerto Rico. Since the beginning of the parties, and again, 38-year marriage, your honors, she's worked tirelessly for the family. She worked in a plastics factory as a babysitter for other families where she could care for her own kids. She worked as a manager of a White Castle so the family could have health insurance and did all of this while Mark was working to start up M&J. These are both hardworking people. I want to make that very clear. Mark's a hardworking guy too, okay? But in fact, the M is for Mark and the J is for Janet in the M&J Machining Company here. As soon as feasible, she went to work 50 to 60 hours a week for M&J, doing whatever needed to be done. Now, she's not a machinist, your honor, like Mark is, who's a self-described and many no one disputes that. And all during this time, she cooked, cleaned, and took care of the family. And then in 2018, Mark, at the top of his profession, at age 57, decided that he didn't want to work anymore. He walked away from M&J, bought a camper. He then wrongfully got an order of protection against Janet, had her thrown out of the house, and moved his girlfriend into the marital residence. But his belligerence towards Janet didn't end there. And it continued toward Janet and the family business. After he walked away from his retirement, he didn't decide to just walk away from business. He didn't decide to simply enjoy his premature retirement. He disobeyed orders. He withdrew hundreds of thousands of dollars from the business and from the family's personal accounts. He stopped Janet's paycheck at the business. He antagonized employees to such an extent that they quit. And Judge, this is an important point. Because if you'll see in the brief, these are machinists. These are people who can be like, really? Bye. There's an enormous demand for these folks. They can walk down the block and get a job the next day. And they're very difficult. He put businesses in the camera to watch Janet, Eric, and the employee, Eric, the party's son, who helped to take over the business after Mark walked away from it. He took the company's books and rifled their offices with his girlfriend and the cameras. Now, so we are aware of the factual background in this case. Okay. And you can continue telling us about the sale that didn't go through, that a receiver was set up and your client used a note to subsidize her son so that he could buy the business and so on and so forth. But I'm just telling you, you got 15 minutes. And if you'd rather talk about the three issues on appeal, it might be much more beneficial to you. Okay. Sure. You know what? That was exactly where I was going. And I really only had a couple sentences left on that introduction. But thank you. Okay. With respect to the allocation, again, as I discussed in the brief, and I do think the brief pretty much, both parties' briefs cover what their positions are fairly well stated. The one thing is that she received about $2 million in property. Now, the thing about taking this note, and I want to get to this because this is the point, and I think I stated our position pretty well in our brief. Mr. DiDomenico's brief suggests that Janet was the architect of this. One important point to remember is that when she took this note, this note ended up with both, this was something that the judge had made the decision to have When she took that note, she was making the best of a bad situation. Okay. By taking that note, the next highest bid for the company was $600,000. Yes, was lower than that. And yes, it was to her son, but both parties received about $600,000 or $300,000 each. Okay. And that occurred after the judgment was entered. She was not the architect of this. She did not ask the court to do this. What she did was what any rational person would do, and that is take the situation that the judge handed her and make an economically reasonable decision of taking the note for the higher amount of money. And yes, it's good that the parties, and I would hope that Mark would also be happy that his son ended up taking over the business rather than it being sold for $600,000 less to another person. Again, all those things that I spoke to you in terms of the allocation, the marital estate, which I just spoke about in terms of her education, her age, she will never be able to have that type of standard of living again. And that also speaks to why she should have maintenance. Mark, at this point, I believe he is, let me see, he is three years older than me. He's 62 years old. Okay. He could work, but instead he's decided, and he's in good health, and all of that is in the record. Okay. And our client doesn't have significant health problems at all. But at this point, again, she's got a 10th grade education. How is she, Mark could go get a job as a machinist anywhere in this country, and he made over $200,000 a year. She can't do that. And instead he's decided in the case law, and I cited it in there, he's decided that he wanted to voluntarily leave and take a premature retirement. Well, God bless him, but that shouldn't prejudice my client because he's made that lifestyle decision. Yes, I'm sorry. Promissory note. Why was it that your client took the promissory notes in the full amounts, you know, in her full 50% and the husband took cash? Why was that decision made? I believe that was the only way that the deal was going to go through. That's my understanding, and that's what had been worked out with the receiver. I don't want to speculate on that, Judge, and it doesn't really appear in the record. Was that for the benefit of the son? Well, I believe certainly that the son benefited, but it's $600,000 more. It's very, there was a company called Armor. Hang on one second here. Armor Group, they were the second highest bidder. This was, again, by her taking that, they both got $600,000 more. And though that's all laid out in the, and you don't have to take my word for it, it's all laid out in the receiver's reports. So when she took this, that's it. But this idea that she's the architect of this, it just doesn't make any sense. What difference does it make whether she's the architect or not? Well, I think what it does, well, because by saying that she's the architect of it, that's what feeds into Mr. DiDomenico's waiver argument and invited error document. By saying she's the architect, it's saying that she invited this situation upon herself, which she didn't. So I think that that speaks directly to that in terms of his argument, sir. So I think that that's really, that that's what's going on with respect to that. Now, let me see. Okay. In terms of contribution, again, and Your Honor, Your Honors, Justice McLaren, you pointed out that you've read, that you guys have read the brief. So you see all of the misconduct that occurred here. This man walked into the business with his brother with a gun. He put up cameras. He took, he withdrew money. He did all sorts of things. And yet my client didn't get any contribution at all to her attorney's fees. And these attorney's fees were driven throughout these proceedings by his misconduct. And again, she shouldn't have, and with respect to the contribution issue, Your Honors, okay, it looks like my screen started getting weird there. With respect to the contribution issue, the judge here pre-judged it. He, notwithstanding the fact that Janet had filed a contribution petition, the judge in his first order, his findings for the judgment order had stated that she hadn't filed no petition and that both parties could afford to pay their fees. Then this was then pointed out by Janet's trial counsel. And then again, the judge then published it again in the judgment. And then the trial counsel had objected to this. She should have at least been given the chance to speak to these things rather than just assuming that she had this ability to pay. And again, there's case law that says, yes, she had $2 million worth of assets here, but she owes, I believe, well, she walked away with about $242,000 in cash. And I did an analysis of that in a brief, which I won't go into, which I would refer you to there. But, you know, she received retirement assets and other assets there. That's the only cash that she had. Mark walked away with, I believe, over 1.2, 1.4. I don't want to mislead you. Hang on, I have it written down here. Yeah, I believe it was about yeah, it was over 1.2 million dollars in cash that he walked away with. Now, our clients, if she owes over, she owes an amount in excess for that. It's about two hundred and eighty, two hundred ninety thousand dollars. So that will take all of the cash that she has to pay that bill. And again, the case law is clear. A party shouldn't have to divest all of their assets to pay their fees, especially in light of what occurred here. And that is the gross misconduct that occurred here. And so I think if you have any questions about any of the arguments that Mr. DiDomenico raised here, I would I would refer you. I don't think you've addressed maintenance or the denial thereof. Oh, OK. Well, thank you. With respect to maintenance, again, all the factors that I talked about here in terms of maintenance, again, she will she is a woman with a 10th grade education. She's 60 years old. She's only got a small amount. She's got to she won't have any cash left after she pays her attorney's bills. And it's a 38 year marriage. And if I may. Well, one thing. Yeah. With respect to maintenance, the judge relied on this Sotil case in his judgment, and he mentioned it there. And in Sotil, which is spelled in re marriage of Sotil, S O T T I L E 2020 I L app second one eight zero seven nine three dash you. It's an unpublished opinion. He likened this case to the Sotil case. But in those in that case, both parties had disabilities and were receiving Social Security disability benefits. Neither party had any significant future employment prospects. And the only asset they had was the marital residence and the former husband's retirement funds, which were essentially divided equally by no stretch of these. Neither of these people were receiving SSI or receiving disability from the government. Mark is as in his own words, he's a master machinist who can go out and find a job tomorrow for the judge to have relied on. This case is just it's bewildering, as I put in the brief. With respect to another issue, was there a hearing on maintenance? Well, well, maintenance was taken with the trial judge. It's one of the issues that was tried in the case. Was the court reserve ruling on the merits on the maintenance? The the court didn't the court refused to give her maintenance and reserve the issue and said, if you look in the judgment, if you look in the judgment, he simply did not give her maintenance here. And one of the issues that the judge talked about, and I discussed this further counsel, if he reserved the issue, then there hasn't been a ruling on the merits. Is that correct? He didn't give her any maintenance at this time. Your honor, she's not. I understand. That's what's important. So and not only that, so was the court in error? The court was in error not to have given her indefinite maintenance. No. Okay. So we're going to skip over whether or not the trial court heard in reserving the issue of maintenance, even though he talked about the dynamics of the sale of the business and how that might affect maintenance. But the net effect here, judges that she's not rich, she's didn't get maintenance. I don't. So this reservation, he shouldn't have he shouldn't have reserved maintenance. He should have simply awarded it to her here at the end of the day. Now, now you're addressing whether or not he heard. In failing to consider on the merits, or put another way, maybe did consider on the merits and decided to reserve maintenance. So, do you want us to force the issue and determine what the maintenance is or should be? Or are you seeking a remand? Or are you going to file a petition for maintenance sometime after this appeal is decided? Well, I believe that the issue should be forced at this point that he should have made a decision and he should have awarded it to her and we didn't and we didn't get that here. Judge. Okay, your time is up. Are there any other questions from the panel? Apparently not. So you'll have an opportunity to make rebuttal. Thank you, sir. Thanks judge. Thank you. Mr. D. Domenico, you may proceed. Justice McLaren, and may it please the court again, Michael D. Domenico for HENUEL Alma Dobar Jr. I've given you a few different, I think there's a few different ways this court could decide this appeal. I think all roads lead to an affirmance. As a threshold issue I did, we did raise invited air and a waiver arguments. You don't have to decide this case that way. The three merits issues that are that have been raised in Mr Adams are all reviewed for an abuse of discretion. But I think that the invited air point emphasizes, or puts a ring around Mr Adams's reliance throughout his brief and in each of the three arguments of the so called disparity and liquidity that the parties exited with. And that is something that Miss Imelda Barr created herself. She's the one that agreed to assist her son Eric in financing, so he could acquire the company. How does that justify a lack of maintenance? Because it's her choice, right? There's a whole line of cases that we cited, I cited, we cited in the brief to talk about self imposed conditions or conditions that you yourself create. You effectively can't, you know, deprive yourself of property, you can't divest yourself of liquidity, you can't take actions in life. One of the cases we cited was, you know, one of the parties seeking maintenance, I think it was a husband, had advanced degrees, had a law degree, had an engineering degree, and just didn't want to go into either field. And this court said, you know, you can't get maintenance under those circumstances if you're going to willfully, you know, make a choice not to earn to your potential. I cited, you know, a case from your colleagues downstate from 43 years ago, where the court took away maintenance from a potential payee for making what they call favorable arrangements for her son by letting him live rent free on her property. That's precisely what Miss Imelda Barr did here. She wanted to help her son. It was always her design to help her son acquire this company. If you were to ask the trial level attorneys on my side of the case, they would tell you that every time they went to court, they felt like it was two against one because Eric was always aligned with his mother. As early as October 4th of 2019, Miss Imelda Barr was moving for the appointment of a receiver in this case, even before Judge Smith did so in his judgment. Who was she suggesting at the infancy of this case to be the receiver? Eric. This was always her design. This is always how she wanted this case to end up. It could be argued and they do argue that the son was already running the business essentially. So what about the argument that they make that the court essentially put Janet into a bit of a box by announcing that if Mark bought the company, he'd essentially be buying maintenance. And if he didn't buy the company, he would not be buying maintenance. Did you see that argument? I saw it on page 42. I did. I mean, the option, it was a bilateral option. It worked both ways. If he bought out the company, if he bought her out, then he would potentially be on the hook for maintenance. If she bought him out, she would potentially be on the hook for maintenance. And I think that that's because the court recognized that in the soul hands of either party, that the company would kick off anywhere between three and four hundred thousand dollars worth of income. So in that sense, it was fair to both sides. Both sides advocated for ownership and control of this company throughout the case. By the time we got to the end of the case, both parties flipped. The judge gave still gave them either one of the either one the option to try to pull off financing to acquire the company. Neither opted to do it. And so it went to the open market. But I don't see I don't see the judge judges in position of the option is boxing her in. She was she either was going to one was going to buy her up, buy each other out or not. How it affects the rest of the maintenance is picking up on something Justice McClaren was asking. You know, the judge, the way the way I understood, Stan, what Judge Smith did, the issue, the issue of maintenance was reserved until such time as it was determined about whether or not either party would buy the other out. Because, again, you recognize that in either party's hands, they would have, you know, approximately three to four hundred thousand dollars worth of income. As I understand the judgment now, it's bar. He doesn't use the word bar. But the way I do it, I understand the judgment is neither party bought each other out. And then as Mr. Adams, I think, you know, touched on in his brief, the judgment said the judgment provides that both parties are going to have to live from the from the award of marital assets. And given the age of the parties, their educational status, either party has a college degree. They both work hard in this company after this long marriage. They're both similarly situated in age, health and education and employability. You know, they said, OK, neither party or neither party. You're going to take on the role of owning MJ machine machine company. Then, you know, you're both going to walk away with the assets that we're dividing up here, which was over four million dollars. And both parties are going to move on with their life and maintenance will be would be barred. That's how I understand the judgment justice. I think that's what you were getting at earlier. As far as the property division goes. It's questionable in my mind related to the invited air point that that this continued reliance on the disparity in liquidity that resulted here, which which she herself created by choosing to help Eric. But the judgment itself doesn't award this a mold of our promissory note. Right. All the judgment says is we're dividing the estate 50 50. It grants the option to either party. And if not, it's going to be sold. So it's questionable whether in my mind you could even argue challenge the 50 50, because it's based upon a premise that includes that she got a promissory note in the judgment. But she didn't. But notwithstanding. This is a 38 year marriage, a four million dollar marital estate, zero non marital property on either side. The three of you would be very likely the first in the history of this state to conclude that a that a circuit court judge abuses discretion by equally dividing a marital estate of that size. After that length of marriage with equal contributions of household maker and professional responsibility and professional contributions as well. I know of no case that supports that outcome. Council certainly cites the night. Lastly, on the attorney's fees. Again, we talk again we can invoke waiver forfeiture here. Council suggests that there should have been a hearing. There's nothing in the record to even indicate that he did request a hearing. There's nothing in his fee contribution petition that requested a hearing. I quoted Mr. Grund at the at the later proceeding on February 19th. When the court entered its findings order, where he said, you know, where he was where Jeff where the where the court was first advised that this multiple bar had filed a contribution petition. And he said, we'll deal with it later. Judge, you know, we'll deal with it later. He never did. And then, of course, a week later, Mr. Maldivar ends up cutting a check to the Grundin-Levitt firm for $50,000, which the judge had to later deal with in a like, in a like, in a like, in a like manner. But, yes, sir. If that petition still pens, was there a 304A finding? It doesn't. Well, it doesn't still pen. I think that the judge made clear on the record that both parties were payment were paying their own attorney's fees. I understand that the judgment, the March 5th judgment was copied and copied and pasted from the findings order, which only made reference to the. That my side at my side's contribution petition and that that was denied and didn't make reference to Miss Maldivar's. But after after the judge was a judge was alerted that she had filed one, he clearly said he read it. He made reference to the allegations in that petition is specifically how much the Grundin-Levitt firm had been paid and how much they were owed. And that after his consideration of the petitions, which he's entitled to do, decided that everybody was going to pay their own fees. So I don't think it's I certainly don't think anybody think Judge Smith thought that this was still out there or it was sort of a lingering issue. I mean, I know that I understand the judgment itself only makes reference to to to my sides, but record reflect any opportunity for Janet to present evidence in support of her request for fees or contribution. So, again, going back to what what what what Mr. Grund, I quoted Mr. Grund saying that, you know, when when the fact when when Judge Smith was corrected and alerted to the fact that Janet had, in fact, filed a fee petition, Mr. Grund said, we'll deal with it at a later time. That never happened. There was nothing in the record indicating any further effort, a motion, a set of hearing any further nothing beyond that in the record. So it's still it's still pending then it's still in the trial court without a resolution. Correct. I don't agree with that. I think as we as we quoted as I excerpted in the brief. It was clear after in the at the March 12 proceeding that both that the judge felt that both parties were going to pay their own attorneys fees and that there'd be no contribution to either sides from either side's share of the estate. And the court, you know, considered the same factors that considered the factors of property and maintenance that he was supposed to do. But the fact of the matter is, is on March 12 and the hearing on the emergency motion about the $50,000 distribution from the company, which again was about attorneys fees. The court made clear that it had reviewed both petitions and that both sides would be responsible for their own fees. I have to check the record to see whether there was actually memorialized in writing, but it couldn't be any clearer what the judge's intention was. And that being that both sides would be paying their own fees and the contribution would be denied as to both parties. Yes, but if there was a motion, for instance, for custody, and the attorney said, we'll get to that later and they don't get to it. Does that mean then they wait that if you have a pending custody motion downstairs, if you will, I don't think you can ever wave anything when it comes to kids. You can wave things when it comes to money. And that is what Mr. Grun did on behalf of his client. He said, we'll deal with this later. It is a money issue. There's no best interest issue. We can't, you know, we don't, there's no such thing as waiver and kids in this state. There's, there is a such thing as waiver and money. And here it's probably actually probably forfeiture. But there was no further pursuit. I think the judge, we want to talk about what the judge was doing. The judge was entitled to rely on what Mr. Grun said. Mr. Grun said, I'll deal with this later. And he never did. And then he made clear at the later proceeding that he'd read the petition, which he's entitled to do. He's entitled to decide it on the fee petition alone. If you read these fee petitions, they're both sides fee petitions were recitation of the evidence from trial and both parties respective positions on the evidence under 503 and 504. So while there may not have been an actual statement added to the judgment that said, oh, Janet's petition is denied to, it couldn't be any clearer from the March 12th transcript. Your syllogism suggests that clarity must be affirmed. And is there any authority for that? I'm not sure. I'm not quite sure how to answer your question. Other than to say that. It's certainly not an argument. I understand that you might view it as jurisdictional. This court might. But, you know, my opponent did not raise this, did not portray. He certainly did not take the position in his brief that this issue is somehow open. Right. Or that the judge didn't decide the issue. He said, well, I should have got a hearing. The judge should have decided it on the petition. And, you know, going to the merits of it, my client only walked away with 200 grand. And so, you know, you should order contribution. But to the extent that there's not, you know, is there a case that says that if there's no written disposition, as opposed to just the transcript, making crystal clear that this what this judge was doing, I don't have an answer to that. All right. I don't have any further unless the court has any additional questions of me. Mr. Adams said something to the effect that your client was healthy and could work. And I believe that your position that he isn't healthy. Is that correct? My position is, is that the circuit court judge is always in a better position than this court in making the determination of whether or not maintenance payors and payees are in a position to rehabilitate themselves to get up on their feet or not. It's not my it's not it's my position that this is not the venue to effectively give a closing argument and rehash the facts. How are we rehashing the facts when the trial court reserved maintenance and hypothecated his future decision based upon the consequences of the receivership and the sale. So, how does what you've suggested relate to anything that was set forth in the record did the court say what you just said in in the process of deciding that it was going to reserve maintenance because if it was, why would it make statements, and then make a reservation. I'm done with the question. The reservation was for a period of time. Okay, as I understand what judgment that the maintenance was for a reservation for a period of time until it was determined whether either party was going to elect to buy the company, because it was going to generate income in that party's hands. If neither party was going to do that, then neither party was going to have that income and that income was going to go to whoever on the on the open market was going to buy the company. That being said, the court, therefore said that then said okay I'm dividing up $4 million. Both parties are going to end up with approximately $2 million. Given what I know given the evidence of their age, their employment history, etc etc their health that I'm going that neither party is going to get maintenance on this record, and that is not an abuse of discretion. Well, when I asked about your clients health. Mr Adams said he was healthy, and I believe your answer was somewhat of a deflection in the sense that you didn't address the, the accuracy of Mr Adams statement, you addressed the, the discretion of the court to consider it. And I don't even think the court considered it but be that as it may, I'll ask the question again. What evidence was in the record that indicated your client was incapable of continuing his vocation as a master machinist. His own testimony, which the court, you know he testified as the various ailments that he had he testified that he was physically unable to work and wanted to retire because he wasn't able to continue to do the work. Judge Smith pointed out there wasn't medical testimony to back that up, but the testimony that the judge did here was from Mr. was from Mr. himself, and the judge is entitled to credit that testimony and weigh it into the maintenance calculator calculation as he sees fit. And I think that that I think he did that he's the judgment itself recognizes that, or makes a note that there wasn't, you know, a doctor call to sort of back to the trust what, what, what, what Mr. was testifying to, but he testified to it, and the judge is entitled to credit that testimony and give it whatever way that he deems it is appropriate and otherwise balancing the 504 factors, if he wasn't capable of working or making a living in the field that he was an expert in. Why did he use to police officers to try and take over the control of the company. Was he planning on abandoning it for lack of good health immediately thereafter. I look, Justice McLaren, there was a lot of acrimony and fighting about control of the company emotions ran high on both sides, he was effectively excluded from the company. It's different points by court order de facto by by Janet and Eric. I think he just, if I, if I recall from the record the instance you're referring to he just wanted to look at the books and the records to see what was going on with the company and what how its fiscal health was was currently doing. Again, there was a lot of back and forth. And, you know, in attempting to seize control of this company it came from both sides I'm not disputing that, but this judge heard all that this judge considered all of that. There's nothing that Mr Adams has said in his briefer this morning that Judge Smith didn't consider. He heard this case from start to finish, he was intimately familiar with all of the machinations of the parties, good and bad. And he, this is and this is the equitable solution that he came up with. And, you know, again, an abusive discretion review. We can certainly hone in on this fact or that fact, but on balance on an abusive discretion review after a judge has heard all of this evidence and considered it for for several years below. I just don't see how we can conclude that any of it amounts to an abusive discretion. So, did the trial court deny maintenance, or did it merely reserve it. I think that, again, the way I understand Judge Smith's paragraph in this regard, it was reserved initially until such time as he as he is it is determined if either party was going to exercise the option to buy the other out. Why, again, that income would ride along with whoever bought it. When neither party did that, the judgment says both parties are going to have to pay their support from the $2 million that that was $2 million plus that he was awarding to each of them. Now, that she divested herself of over half of that by deciding to help out her son. That's up to her. That's on her. That's up to her. But how I, you know, again, going back to the invited air point, how she can be heard to complain about, you know, I need more maintenance. I need more fees and I want more property when she gave up a $1.2 million in cash that she otherwise would have had. I just don't see how she can be heard on really any of this. But even on the merits, Judge Smith heard all of this considered it and an abusive discretion review. I just don't see how you can conclude that no reasonable person would have disposed of this case how Judge Smith did. So, it's your position that the trial court did not reserve maintenance. It initially my position is, is he initially reserved it pending his pending the outcome of whether or not either 1 of them would buy the other out of MJ machinery. I didn't ask you about initial. I, I'm asking you about the end result. The final judgment what we're dealing with on this appeal. It is your position. Apparently, and correct me if I'm wrong, that maintenance was denied, because initially it wasn't but if it continued on afterwards after the receivership sale and so on. And if it changed its status, then either the petition was withdrawn and there was never an issue raised or the issue wasn't properly considered later on. That is my, if I understand you correct, that is my position. It was reserved, but as we stand here today, the status of the maintenance issue is adjudicated after a full trial after a judge hearing all the evidence under 503 and 504. And now it's bar, because both of these people are similarly situated age, income and employment employability and, and help assets for the assets for that matter. Your time is up counsel, are there any other questions from the panel. Your, your speakers are off. No. Okay, thank you. Thank you counsel. Mr Adams, you may proceed. I just briefly address the, the comment made by Mr D Domenico. He said that. Well, that she divested herself of money here when she decided to take the note. I mean nothing could be less true as a result of her taking the note. His client has $300,000 more in cash. Again, the reason he could have had more in cash, but she took the note correct. She could have had more in cash but she ended up with $300,000 more by taking the note. And so I think that she made a rational economic decision and doing that. After the, after the judge said, you know, instructed the receiver to sell off the, the, the business I, you know, clearly having $300,000 more I think was the right decision for her. In terms of this, Mr D Domenico is, is, has discussed a lot that, you know, it ended up that her son owned it and ended up owning the business. Well, yeah, she didn't want her son to have it, but her son also paid more than the armor group would have paid her to. What is your response to what Mr D Domenico said about your waiving that fees? Well, yeah, sure, sure. In our reply brief, we discussed this, there was a quote and the interesting thing is Mr D Domenico quoted from a colloquy that occurred. And the thing is, is in that very same college, we Mr. Run talked about you failed to give us a contribution petition. And then he says, oh, Mr. Grunt said, we'll deal with that later. He was talking about what they were doing that day. And so the idea that we, that we, that we waived this when Mr. Grunt on page R1288 said you failed to give us a contribution petition, he complained about this. In the reply brief, I discussed this issue and went through it very carefully. And so, yes, I don't think it's fair to say that we waived that issue. I do believe that the judge decided it. When I looked at that judgment and he said, you know, you can both pay your own fees. Part of the issue that I think that part of the problem was, is that he prejudged the issue and didn't give us that hearing. But he did decide not to give us the fees that on that point, I think Mr. D Domenico are in rare agreement with respect to this case. But no hearing on the fees. There was never a hearing. No, no, there was no hearing. The judge, in fact, said at one point, you know, he said that he'd read the, you know, he'd read our petition. He made that very clear. He looked over it. In fact, and that's that's in that same colloquy with Mr. Grunt, who was Janet's trial attorney. Do you have any comment or response to Mr. D Domenico's statement regarding the finality and denial of maintenance? Of the finality and denial. In other words, he said initially it was reserved, but later on it wasn't. If it wasn't, was there a hearing on the maintenance issue or was it just denied based upon the fact that your client gave a note? It certainly wasn't. It wasn't denied. The note had the note occurred after the judge made this decision. It was denied upon the fact that the judge stated about. In the future. Factual scenarios that would affect his consideration of maintenance. Did he not did he not talk about the fact that if 1 bought the other out that therefore somebody may or may not get maintenance. The judge did talk about that and did he also talk about if somebody didn't buy the other person out, but merely gave a note to Eric that they may not get maintenance as well. Are not all these factual scenarios that he was hypothecating upon were taking place after his ruling. On the reservation of maintenance. That he was hypothecating on whether with respect to the note, I can't. I don't recall that from the record, but with respect, I mean, he made his decision. He said, look, basically, what occurred here is. Is that Mark didn't buy out the business and so he was off the hook for having to pay the maintenance. That's my reading of that judgment. Okay, let me see. There was 1 other thing. Oh, again. Just 1 more comment here. Mr. D. Minico said the people were similarly situated with respect to their education. I don't remember. I think Mark might have been a high school graduate. He might not have been. But the point is, yes, maybe in terms of their education, 1 had 1 or 2. Maybe he had a year or 2 more of high school than her. But that's not the that's not the important thing. You know, I have a law degree, but Mark also is a skilled tradesman. And he made 200 grand a year as a machinist. There's no way that anybody can tell me that Janet Almodovar, who's not a machinist, can go out and make that type of money today. And again, to your point that you raised earlier, Justice McLaren, he decided at age 57, he didn't want to work anymore. And he had other pursuits, which I'm not going to repeat here at this point. Aside from that, I'd just like to thank you, Justice McLaren, Justice Kennedy, Justice Shostak, for your time today and also for accommodating my illness and rescheduling this oral argument. It was very gracious of you, and I appreciate that. You're welcome. We'll take the case. Pardon me. Any other questions from the panel? Okay, thank you. We will take the case under advisement and hopefully render a decision in half time. Thank you. Mr. Clerk, you may close out the case. Yes, sir.